

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2450 | **DATE** | 9/24/2004 |
| **CASE TITLE** | ELIZABETH S. SHRADER vs. PALOS ANESTHESIA ASSOCIATES | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants Palos Anesthesia Associates and Michael Sobczak, M.D.'s motion to strike [doc. no. 76-1] is granted in part and denied in part. Defendants' motion for summary judgment [doc. no. 64-1] is granted. This case is hereby terminated. Any pending motions and schedules are stricken as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

SEP 2 4 2004

date docketed

docketing deputy initials

date mailed notice

CG    courtroom deputy's initials

U.S. DISTRICT COURT

Date/time received in central Clerk's Office

**Document Number**

80

2004 SEP 24 AM 9:19

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ELIZABETH S. SHRADER,  )
)
      Plaintiff,  )
)
      v.  )     **01 C 2450**
)
PALOS ANESTHESIA ASSOCIATES,  )     **Judge Ronald A. Guzmán**
S.C. and MICHAEL SOBCZAK, M.D.,  )
)
      Defendants.  )
)

## MEMORANDUM OPINION AND ORDER

Plaintiff Elizabeth S. Shrader ("Shrader") brings this action against her former employer Palos Anesthesia Associates ("PAA") and its president Michael Sobczak, M.D. ("Sobczak") for wage discrimination and retaliation for engaging in statutorily protected activity in violation of the Equal Pay Act ("EPA"), 28 U.S.C. §§ 206(d) and 215(a)(3).

Shrader first claims that she suffered wage discrimination on the basis of gender when she received reduced bonuses from PAA in August 1998 and December 2000. She further claims that she was subjected to the following adverse employment actions in retaliation for complaining about the reduced bonus she received in August 1998: (1) reducing her bonus in December 2000; (2) reducing her base compensation; (3) refusing to assign her work unless she reported daily to Sobczek; (4) attempting to secure her resignation; (5) communicating with her via certified mail; (6) excessive monitoring of her work; (7) refusing to accommodate her health needs; (8) refusing to speak to her; and (9) denying her shareholder status in PAA.

Before the Court are Defendants' Motion for Summary Judgment and Defendants' Motion to Strike Plaintiff's Declaration. For the reasons set forth below, Defendants' Motion to Strike Plaintiff's Declaration is granted in part and denied in part, and their Motion for Summary Judgment is granted.

## FACTS

Shrader began her employment as an anesthesiologist with PAA in November 1996. (Defs.' LR 56.1(a)(3) ¶ 5.) PAA provides anesthesia services to Palos Community Hospital (the "Hospital"). (*Id.* ¶ 3.) Sobczak is Chairman of the Department of Anesthesiology at the Hospital and is President of PAA. (*Id.* ¶ 2.)

Shrader's normal work hours at PAA varied and could range from forty to eighty-plus hours a week. (*Id.* ¶ 13.) Shrader was off work for two weeks in July 1998 due to a back injury and then worked reduced eight-hour shifts until approximately October 1, 1998, after which she resumed the normal schedule. (Pl.'s LR 56.1(b)(3)(A) ¶ 15.) Plaintiff was paid a full salary in July and August, but her salary was decreased by 33% in September due to the decreased work schedule. (Defs.' LR 56.1(a)(3) ¶ 16.) Plaintiff agreed to the salary reduction. (Pl.'s LR 56.1(b)(3)(B) ¶ 1.)

In August 1998, Shrader received a bonus of $5,000. (Defs.' LR 56.1(a)(3) ¶ 19.) At the same time, Drs. Andoniadis and Peterson, two other anesthesiologists at PAA who started at the same time she did, received bonuses of $42,000 each. (*Id.* ¶ 20.) Shrader learned of the higher bonuses received by other doctors at PAA from Andoniadis in November 1998. (*Id.* ¶ 23.) After Shrader learned of the difference between her bonus and those of other PAA doctors, she spoke with Dr. Kathleen Drinan, a physician on staff at the Hospital. (*Id.* ¶¶ 24-25.) During this conversation,

2

Shrader told Drinan that she had received a much lower bonus than the rest of the group and needed the number of an attorney. (*Id.* ¶ 24.) Following this conversation, Drinan spoke with Sister Margaret Wright, the Chief Executive Officer of the Hospital, about the discrepancy in Shrader's bonus. (*Id.* ¶ 26.) Wright testified that Drinan had told her Shrader was unhappy, but she does not remember the "particulars" of the discussion, including whether Drinan said that Shrader felt discriminated against. (*Id.* ¶ 27; Wright Dep. at 36, Defs.' App. at 76.)[1] Neither Drinan nor Wright discussed Shrader's bonus with Sobczak. (Defs.' LR 56.1(a)(3) ¶¶ 28-29.)

Thomas Lavery, Vice President of Medical Affairs for the Hospital, eventually told Sobczak that Shrader was unhappy with the reduction in her August 1998 bonus.[2] (*Id.* ¶ 30.) Sobczak then confronted Shrader about her complaint, telling her that it was "like a Linda Tripp scenario" because she had expressed her unhappiness to someone outside of the group, and the outsider then relayed Shrader's unhappiness to yet another individual. (Pl.'s LR 56.1(b)(3)(A) ¶ 30.) Sobczak told Shrader that she had caused irreparable damage to the anesthesia group that would take years to fix, that the group could lose its contract with the hospital, and that loose lips sink ships. (*Id.*) Nevertheless, Shrader was given an additional $20,000 bonus in November 1998 in response to her complaint. (Defs.' LR 56.1(a)(3) ¶ 31; Pl.'s LR 56.1(b)(3)(A) ¶ 31.)

In 1999, Shrader was experiencing difficulty conceiving a child and wanted to begin seeing a fertility specialist on a regular basis. (Defs.' LR 56.1(a)(3) ¶¶ 101-02.) In January 2000, Shrader

---

[1] The depositions and other materials offered in support of the motion for summary judgment were submitted in the form of a successively paginated Appendix rather than by numbered exhibits.

[2] The parties do not clarify whether Drinan or Wright told Lavery that Shrader was not happy with her bonus.

3

approached Sobczak about working a reduced schedule, and he requested that she "fill out a wish list" of the perfect job. (*Id.* ¶¶ 33-34.) The job description she returned to him specified working 35 to 40 hours a week and receiving benefits, an annual salary between $160,000 and $165,000, six weeks of vacation, some portion of a bonus, and $100 an hour for any time accrued over 40 hours a week. (*Id.* ¶ 35.) In a letter dated January 10, 2000, Shrader was informed that a part-time position was not available for her or anyone else for the foreseeable future. (*Id.* ¶ 36.) None of the doctors at PAA had this sort of work schedule. (*Id.* ¶ 37.) Sr. Wright testified at her deposition that after several conversations with Shrader during this period in which Shrader complained about needing more time off, Wright eventually told Shrader that she would have to find such a schedule someplace else because the schedule Shrader wanted was more appropriate for a surgery center. (*Id.* ¶¶ 39-40, 42.)

In November 2000, Sobczak informed Shrader that the members of the anesthesiology department had decided that Shrader should not be a shareholder in PAA. (*Id.* ¶ 71.) Sobczak states that the reasons for this decision were concerns about Plaintiff's patient care based on a series of three problems that occurred from June 2000 to October 2000 and her failure to discuss these issues with him. (*Id.* ¶¶ 72-74.)

Sometime in October, November, or December 2000, after Sobczak received a letter regarding Shrader's pursuit of staff privileges at Elmhurst Memorial Hospital, Sobczek had a conversation with Shrader in which he encouraged her to look for another position. (*Id.* ¶¶ 49-50, 60-62; Pl.'s LR 56.1(b)(3)(A) ¶ 49.) In this same conversation, Shrader asked Sobczak if he would give her a satisfactory recommendation. (Shrader Dep. at 169, Defs.' App. at 26.) Sobczek responded that he would. (*Id.*)

4

By letter dated November 27, 2000, Lavery, the Hospital's Vice President of Medical Affairs, sent Shrader an application for reappointment to the Hospital's staff for 2001 (Defs.' LR 56.1(a)(3) ¶ 52.) Shrader never completed this application because she saw no urgency in doing so, as her current appointment extended through March 31, 2001. (Pl.'s LR 56.1(b)(3)(A) ¶ 53.)

On December 1, 2000, Sobczek hand-delivered a letter to Shrader asking that she meet with him regarding patient care issues and incidents, further stating that Sobczek was troubled by Shrader's past unwillingness to discuss these issues, and directing Shrader "to do whatever is necessary" to meet with him. (Defs.' LR 56.1(a)(3) ¶ 96.) A meeting was never scheduled by either Sobczek or Shrader, who was out of town at a medical conference the following week and who also felt she could not meet with Sobczek without legal representation present. (*Id.* ¶ 97; Pl.'s LR 56.1(a)(3) ¶ 97.)

Later in December 2000, Shrader received a bonus of $10,000 while another doctor, Dr. Boudeman, received a bonus of $2,500, and PAA's other doctors received bonuses of $34,000. (Defs.' LR 56.1(a)(3) ¶¶ 63-65.) At the time the December 2000 bonuses were given, Boudeman was preparing to leave PAA and had been in PAA's employ only a few months before this bonus check was issued. (*Id.* ¶ 65; Pl.'s LR 56.1(b)(3)(A) ¶ 65.) Sobczak states that both Shrader's and Boudeman's bonuses were decreased because they were planning on leaving PAA. (Defs.' LR 56.1(a)(3) ¶ 65.) Plaintiff avers that she had not yet committed to leaving PAA in December 2000. (Pl.'s LR 56.1(b)(3)(B) ¶ 30.) In the period between the August 1998 bonus and the December 2000 bonus, Shrader received the same bonuses as the other PAA employees at her level in each quarter bonuses were awarded. (Defs.' LR 56.1(a)(3) ¶ 32; Payroll Journals, Defs.' App. at 95-184.)

On January 5, 2001, Shrader attended an orientation meeting for new employees at Elmhurst Memorial Hospital. (Defs.' LR 56.1(a)(3) ¶ 55.) Shrader had informed Sobczak that she would be attending this meeting and that she did not know when she would be returning. (*Id.* ¶ 56.) Elmhurst Memorial Hospital sent Shrader an employment agreement for her signature by letter dated January 16, 2001. (*Id.* ¶¶ 57-58.) Although the parties do not specify the date, Shrader ultimately signed the Elmhurst Hospital employment agreement. (*Id.* ¶ 58.)

On January 9, 2001, Sobczek sent Plaintiff a letter via certified mail after having called Shrader, as well as her mother. (*Id.* ¶ 98; Pl.'s LR 56.1(b)(3)(A) ¶ 98.) Shrader was on a two-week vacation when the letter was sent and did not respond orally or in writing. (Defs.' LR 56.1 (a)(3) ¶ 100; Pl.'s LR 56.1(a)(3) ¶ 98.) This letter expressed Sobczak's concern about whether Shrader planned to return to the Hospital because of her discussions with Elmhurst Hospital and because she scheduled her two-week vacation to start immediately after Friday, January 5, 2001, the date of her meeting at Elmhurst. (Defs.' LR 56.1(a)(3) ¶ 99.) The letter concluded by stating: "You are hereby requested, immediately upon reading this letter, to take all steps, including those which you might consider 'heroic measures,' to contact me in live conversation (as distinguished from a phone mail message, or similar means)." (*Id.*)

On February 6, 2001, Sobczek sent a letter to Shrader stating that, assuming she continued to be an employee of PAA through May 11, 2001, at which point her employment with the group would be terminated, her compensation would be reduced to $10,000 a month beginning February 9, 2001. (*Id.* ¶ 103.) In this same letter, Sobczek directed Shrader to report to him for her assignments at the beginning of each regular work day beginning February 12, 2001. (*Id.* ¶ 93.) On February 11, 2001, Shrader came to Palos Community Hospital to clean out her locker and pick up

6

up her check. (*Id.* ¶ 106.) She was given a voluntary resignation letter to sign because it was the customary policy of the Hospital to obtain such letters. (*Id.* ¶ 106-07.) While Shrader agrees that it was the Hospital's policy, she states that she was not an employee of the Hospital. (Pl.'s LR 56.1(b)(3)(A) ¶ 107.) Shrader eventually showed the letter to her attorney, who advised her not to sign it. (Shrader Dep. at 195-96, Defs.' App. at 32.) Shrader began working at Elmhurst Memorial Hospital the next day. (Defs.' LR 56.1(a)(3) ¶ 59.)

## DISCUSSION

### Motion to Strike Plaintiff's Declaration

Before ruling on the merits of the Defendants' Motion for Summary Judgment, the Court will address their Motion to Strike Plaintiff's Declaration.

Pursuant to Federal Rule of Civil Procedure ("Rule") 56(e), "supporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." Although personal knowledge might include reasonable inferences and opinions, these inferences and opinions must be tied to specific, concrete facts. *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988). Thus, self-serving or conclusory affidavits lacking support in the record and based on speculation or conjecture are insufficient. *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

The following paragraphs of the declaration are stricken: Paragraph 2 (second sentence) lacks foundation and contradicts Plaintiff's deposition testimony; Paragraph 3 (second sentence) contains inadmissible hearsay; Paragraph 5 is inadmissible hearsay; Paragraph 10 contains inadmissible hearsay, and there is no foundation for the last two sentences in the paragraph;

7

Paragraphs 11-12 contain inadmissible hearsay; Paragraph 18 lacks foundation and contradicts Plaintiff's deposition testimony; and Paragraphs 25 and 32 (second sentence) contain inadmissible hearsay.

## Motion for Summary Judgment

Pursuant to Rule 56(c), summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must decide whether "there are genuine factual issues that can be properly resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In making this determination, the Court draws all reasonable inferences in favor of the non-moving party. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). The summary judgment standard is applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). In order to defeat a motion for summary judgment, the non-moving party must set forth admissible facts demonstrating that there is a genuine issue of material fact that must be resolved at trial. *Anderson*, 477 U.S. at 248. Hearsay evidence is not admissible evidence and therefore cannot be used to create a genuine issue of material fact. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994).

## I.    Equal Pay Act

Plaintiff first claims her reduced bonuses in August 1998 and December 2000 violated the EPA, which provides:

> No employer . . . shall discriminate . . . between employees on the
> basis of sex by paying wages to employees . . . at a rate less than the
> rate at which he pays wages to employees of the opposite sex . . . for
> equal work on jobs the performance of which requires equal skill,
> effort, and responsibility, and which are performed under similar
> working conditions . . . .

29 U.S.C. § 206(d)(1).

To establish a *prima facie* case of discrimination under the EPA, a plaintiff therefore must show "'(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions.'" *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003) (quoting *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998)). The plaintiff need not offer proof of discriminatory intent to prevail on a claim brought under the EPA. *Cullen*, 338 F.3d at 698.

"In determining whether two jobs are equal, the crucial inquiry is 'whether the jobs to be compared have a 'common core' of tasks, *i.e.*, whether a significant portion of the two jobs is identical.'" *Id.* (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989)). If the plaintiff establishes that the two jobs have a "common core," the Court must then determine "whether any additional tasks make the jobs 'substantially different.'" *Id.* In addition, whether jobs require equal work requires consideration of three separate elements: skill, effort, and responsibility. 29 U.S.C. § 206(d)(1); *see Cullen*, 338 F.3d at 698. "Each of these elements must be met individually to establish a *prima facie* case." *Cullen*, 338 F.3d at 698 (citing 29 C.F.R. § 1620.14).

Once a plaintiff proves her *prima facie* case, the burden of persuasion then shifts to the defendant to prove a statutory affirmative defense. *See Cullen*, 338 F.3d at 702 (noting that defendants bear the burden of proof on their affirmative defense). PAA and Sobczak argue that the

differences in Plaintiff's bonuses were the result of "a differential based on any other factor other than sex," the fourth affirmative defense to an EPA claim. 29 U.S.C. § 206(d)(1)(iv). This affirmative defense has been described as "a broad 'catch-all' exception [that] embraces an almost limitless number of factors, so long as they do not involve sex." *See Fallon*, 882 F.2d at 1211. This exception ensures that courts and administrative agencies do not "substitut[e] their judgment for the employer's judgment and avoids unnecessary disruption of bona fide job evaluation systems." *Id.* In fact, the Seventh Circuit does not even require that the reason for the pay differential be related to the requirements of the position or that it be business-related at all, as long as the factor is bona fide and applied in good faith. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 913 (7th Cir. 2002); *Fallon*, 882 F.2d at 1211.

In this case, it appears undisputed that Shrader's position had the same level of skill and responsibility as those of other PAA physicians. With regard to her August 1998 bonus, however, Plaintiff has not established that her job required the same level of effort. During the weeks immediately preceding that bonus, Plaintiff was off for two weeks and worked a forty-hour week approximately six weeks thereafter. According to Shrader's description of her regular work schedule, she normally worked from forty to upwards of eighty or more hours each week. Therefore, it cannot reasonably be disputed that Plaintiff did not exert the same level of effort as the male physicians at PAA, none of whom were on a limited schedule during this period. *See Cullen*, 338 F.3d at 699. Moreover, even if Plaintiff had established her *prima facie* case of discrimination related to the 1998 bonus, Defendants have established that the reduction was based on a "factor other than sex," *i.e.*, the number of hours Shrader worked. In support of this argument, Defendants offer the example of a male doctor, Dr. Kramer, who missed five weeks of work in 1992 and did not

receive a bonus at all for that period. (Defs.' LR 56.1(a)(3) ¶¶ 21-22; Kramer Decl. ¶ 2, Defs.' App. at 91.)

Plaintiff first responds that the 40% reduction in her bonus was arbitrary as compared with her agreed 33% reduction in salary for the month of September 1998.[3] However, Plaintiff's argument does not contradict the fact that the bonus was lowered as a result of her reduced hours. Plaintiff has offered no case law, and the Court has found none, requiring mathematical precision in the awarding of a discretionary bonus, as long as the amount of the bonus was not based on sex.

Second, Plaintiff contends that Kramer's case is distinguishable because he was gone for five weeks, whereas she was gone for only two weeks and then worked a reduced schedule for approximately six weeks before the August 1998 bonus was awarded. Plaintiff's attempt to distinguish Kramer is unavailing because she was not treated less favorably than he was. Kramer did not receive any bonus the quarter after his absence, while Shrader ultimately received a bonus of $25,000.[4] The Court finds that Defendants have met their burden of showing the amount of the August 1998 bonus was based upon a legitimate factor other than sex.

As for the December 2000 bonus, there is no dispute that Plaintiff exerted equal skill, effort, and responsibility, and thus she has demonstrated a *prima facie* case of wage discrimination under

---

[3] Elsewhere in her response, Plaintiff argues in passing that the 33% reduction in her base pay was contrary to the disability provisions in her employment contract with PAA. However, Plaintiff is not suing for breach of contract, and more importantly, she admits that she agreed to the reduction.

[4] Moreover, a rough comparison of Shrader's and Kramer's cases suggests that Plaintiff received this bonus despite missing nearly as many hours as Kramer had. Based on her range of normal working hours (from forty to eighty or more per week), it may be assumed that she worked an average of approximately sixty hours a week under a normal schedule. Therefore, Shrader's two weeks off plus six forty-hour weeks at a reduced schedule would amount to a net of 240 hours off (or four average weeks), compared with Kramer's five missed weeks.

the EPA. Defendants argue this bonus was reduced for a reason other than sex, *i.e.*, because Sobczak believed Plaintiff intended to leave PAA at the time the bonuses were given. Defendants point to the example of Dr. John Boudeman, who was leaving PAA as of December 2000 and also received a reduced bonus.

Plaintiff responds that (1) bonuses were awarded based on prior work, and her future plans were not relevant to the amount of the bonus; (2) she had not yet committed to leaving at the time the December 2000 bonus was given; and (3) Boudeman had only been at PAA for a short time before the bonuses were given, which "may be the reason" his bonus was reduced. (Pl.'s Resp. Mot. Summ. J. at 5.)

The Court finds that Defendants have met their burden of showing that Plaintiff's December 2000 bonus was reduced for reasons other than sex. First, other than Plaintiff's own testimony, there is no evidence in the record that bonuses were awarded for past work alone, and she admitted she had no particular basis for this belief. (*See* Shrader Dep. at 35-36, Defs.' App. 6); *see also Miller*, 203 F.3d at 1009 (holding that it is not discriminatory for an employer to terminate an employee whom it believes lacks commitment and intends to leave the company).

Second, it is irrelevant to the inquiry whether Shrader actually had decided to leave as of December 2000. Sobczak believed she was leaving, and this belief was not without foundation, given that he had already received a letter about staff privileges for Shrader at Elmhurst Hospital, and Plaintiff had asked him for a recommendation. Finally, Boudeman's apparently short tenure at PAA does not demonstrate that Plaintiff's bonus was reduced for a reason other than sex because Boudeman's bonus was $7,500 *less* than Shrader's. None of Plaintiff's arguments overcome the undisputed evidence that the amount of the December 2000 bonus was based on a factor other than

sex. *See Markel*, 276 F.3d at 913 (noting that a plaintiff's "bald assertions" that there were no grounds other than sex for pay disparities is not enough to defeat summary judgment on an EPA claim). Defendants' Motion for Summary Judgment is therefore granted as to Plaintiff's claims of wage discrimination in violation of the EPA for both the August 1998 and December 2000 bonuses.

## II.    Retaliation

Plaintiff next claims that she was retaliated against in a number of ways for complaining about her August 1998 bonus. Retaliation claims may be proved either directly or indirectly. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Under the direct method, a plaintiff must show: (1) that she was engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) a casual connection between the two. *Haywood*, 323 F.3d at 351.

Plaintiff seeks to prove her retaliation claim under the indirect method, which dispenses entirely with the requirement of a causal connection and represents an adaptation, in the retaliation context, of the burden-shifting approach announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5] *See Stone*, 281 F.3d at 644. Thus, under this method, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she performed her job in accordance with her employer's legitimate expectations; (3) she suffered an adverse employment action in spite of

---

[5] The Seventh Circuit has not addressed a claim of retaliation under the EPA since its 2002 decision in *Stone*, which extended the *McDonnell Douglas* burden-shifting approach to Title VII retaliation claims. However, because EPA and Title VII retaliation claims are generally construed in harmony, the Court holds that the *Stone* approach governs the resolution of Plaintiff's claims.

satisfying the legitimate expectations of her employer; and (4) she was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Haywood*, 323 F.3d at 531.

If the plaintiff succeeds in demonstrating a *prima facie* claim, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If and when the defendant has met its burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's stated reason is pretextual. *Id.*; *see Miller*, 203 F.3d at 1008 ("'Pretext' is more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.") (internal quotations omitted).

Shrader alleges that she suffered various forms of retaliation for complaining about her August 1998 bonus. Defendants argue that they were unaware that Shrader had engaged in any statutorily protected activity; she was not treated less favorably than similarly situated male employees; in some cases, she did not suffer adverse employment actions; and in other cases, there were legitimate non-invidious reasons for the adverse employment actions.

A.    **Statutorily Protected Activity**

In order to prove an indirect claim of retaliation, Plaintiff must first demonstrate that she engaged in a statutorily protected activity, such as complaining about discriminatory treatment. In a case concerning a retaliation claim brought under Title VII, whose elements mirror those for retaliation claims brought under the EPA, the Seventh Circuit has stated that while "an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.'" *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (quoting *Miller*, 203 F.3d at 1007-08).

14

"An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Miller*, 203 F.3d at 1008.

In this case, Shrader has utterly failed to demonstrate either that she engaged in protected activity or that Defendants knew she had done so. Shrader has focused entirely on whether Sobczak knew of her complaint without demonstrating that it was a complaint about gender discriminatory conduct. When Shrader learned of the difference between her bonus and those of other PAA doctors, she spoke with Dr. Drinan, a physician on staff at the Hospital, but who was not affiliated with PAA. Plaintiff's account of this conversation reveals that Shrader told Drinan that she had received a much lower bonus than the rest of the group and needed the number of an attorney. Shrader did not testify that she mentioned discrimination in this conversation, and her request for an attorney did not, without more, signal such a claim, particularly given that her employment with PAA was contractually based.

More importantly, even if Shrader had raised a claim of discrimination to Drinan, there is absolutely no evidence from which a reasonable jury could conclude that such a claim was communicated to Defendants through Drinan, who spoke to Sr. Wright, who spoke to Lavery, who spoke to Sobczak. Plaintiff has not shown that any of these people recalled Shrader's complaint about her bonus as being rooted in a discrimination claim. In short, while Sobczak knew Shrader was unhappy about her bonus, Plaintiff has offered no evidence even suggesting Sobczak knew Shrader was unhappy because of sex discrimination. *See Miller*, 203 F.3d at 1008 (affirming summary judgment where plaintiff failed to produce "evidence from which it could reasonably be inferred that her employer more likely than not knew she was concerned about . . . discrimination")

15

(internal quotations and alterations omitted). Complaining about one's pay is not statutorily protected; complaining about discriminatory pay is. *See id.* (holding that complaints of "general displeasure" are not protected expression). Plaintiff's claim of retaliation therefore fails on this basis alone.

### B.    <u>Alleged Acts of Retaliation</u>

Even if Plaintiff had established that she engaged in statutorily protected conduct known to Defendants, each of her claims of retaliation would fail for other reasons. The Court will discuss each of the alleged retaliatory acts in turn.

#### 1.    <u>Reducing December 2000 Bonus</u>

In addition to claiming that the reduction in her December 2000 bonus violated the EPA, Plaintiff claims that it was a retaliatory act. First, Plaintiff cannot established that this was an adverse employment action because her bonus was discretionary. (*See* Anesthesia Services Agreement, Section 3(b), Defs.' App. at 36C (". . . The Corporation agrees to pay Employee such other and further compensation or benefits as the Board of Directors of the Corporation shall, in its discretion, determine from time to time.")). The loss of a discretionary bonus does not constitute an adverse employment action. *See Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996); *Fitch v. Cont'l Cas. Co.*, No. 01 C 1149, 2002 U.S. Dist LEXIS 24269, at *15 (N.D. Ill. Dec. 13, 2002). Finally, as discussed in detail above, Defendants have offered legitimate reasons for the reduction in bonus, and Plaintiff has not demonstrated that Defendants' reasons were a pretext.

## 2. Notifying Plaintiff That Her Salary Would Be Reduced

Plaintiff next argues that the letter she was sent by Sobczak on February 6, 2001 stating that her compensation would be reduced to $10,000 a month beginning February 9, 2001 made it intolerable to continue her employment at PAA.[6]

While a reduction in salary may constitute a constructive termination, *see Zabielski v. Montgomery Ward & Co., Inc.*, 919 F.2d 1276, 1281 (7th Cir. 1990), Plaintiff admits that the threatened salary reduction did not take place because she began other employment before the reduction took effect. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse."). Plaintiff therefore suffered no adverse employment action. Moreover, the letter states that Plaintiff's compensation would be reduced to the base amount set forth in her employment agreement for the final period of her employment, in anticipation of her termination on May 11, 2001. The undisputed evidence in the record demonstrates that at the time the letter was written, Defendants believed that Plaintiff was leaving the practice, and they also had concerns about Plaintiff's performance. These are legitimate non-discriminatory reasons for the proposed reduction in pay, and Plaintiff offers no evidence that they were pretextual.

## 3. Requiring Plaintiff to Report to Sobczek

---

[6] It appears unlikely that Plaintiff's decision to leave PAA occurred only after she received the February 6, 2001 letter, given that she had attended a new employee orientation meeting at another hospital a month before and that she began working at that hospital a week later. However, Defendants' deposition questioning failed to elicit from Plaintiff (or at least Defendants have failed to apprise the Court) the date on which Plaintiff signed her employment contract with Elmhurst Hospital, so the Court must give Plaintiff the benefit of an inference that she did not decide to leave until after February 6, 2001.

In the February 6, 2001 letter, Sobczek also directed Shrader to report to him for her assignments at the beginning of each work regular work day on February 12, 2001. Shrader contends that this additional requirement amounts to an adverse employment action. First, as with the salary reduction, this threatened action never occurred because Plaintiff began working at another hospital on February 12, 2001. Second, even if it had occurred, Plaintiff has not established that such a reporting requirement would amount to a material change in her job responsibilities that would constitute an adverse employment action.

An adverse employment action must be "'a materially adverse change in the terms and conditions of employment.'" *Rabinovitz*, 89 F.3d at 488 (quoting *Crady v. Liberty Nat'l Bank & Tr. Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). The Seventh Circuit has declined to create a discrete list of adverse employment actions due to the number and uniqueness of individual employment situations, but it has indicated that "materially adverse actions may include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities.'" *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (quoting *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 1999)); *see also Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (holding that an adverse employment action need not be readily quantifiable, but it must still be material).

A materially adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rabinovitz*, 89 F.3d at 488. Work restrictions such as requiring an employee to report to management when leaving and returning to the office "do not amount to adverse employment actions" where the restrictions do not relate to the employee's responsibilities or title and "appear rationally related to the explanation given for their imposition."

*Id.* at 486, 489. In this case, the reporting requirement appears rationally related to Sobczak's concern about patient care issues, as well as Shrader's recent failure to communicate with him, and thus was not an adverse employment action.

### 4. Attempting to Secure Plaintiff's Resignation

Plaintiff argues that Defendants retaliated against her by trying to have her sign a voluntary letter of resignation, again apparently arguing constructive discharge. First, Defendants' efforts to secure Plaintiff's signature could not reasonably be seen as amounting to constructive discharge. Plaintiff testified that before February 11, 2001, the only attempt made to procure her resignation was Sobczak's mere preparation of the letter. (Shrader Dep. at 215, Defs.' App. at 33.) Shrader does not allege she was harassed or threatened to sign. Moreover, the last time she was asked to sign the resignation letter, on February 11, 2001, Plaintiff was at PAA to clean out her locker and pick up her last check before starting her new job the following day.

Second, Defendants' attempts to have Plaintiff sign the letter did not amount to an adverse employment action because she never signed it. Finally, Defendants offer a legitimate reason for seeking the letter, *i.e.*, that the Hospital asks all employees to do so. Plaintiff responds that this reason is pretextual because she was an employee of PAA, not the Hospital, but she has failed to establish that other similarly situated PAA employees were not asked to sign a similar letter.

### 5. Communicating With Plaintiff Via Certified Mail

Plaintiff next argues that on January 9, 2001, Sobczak sent her a letter via certified mail in retaliation for her complaints about her August 1998 bonus. First, it is inconceivable that sending a certified letter amounts to an adverse employment action, even if Shrader had demonstrated that other similarly situated employees had not received such a letter. *Smart v. Ball State Univ.*, 89 F.3d

19

437, 441 (7th Cir. 1996) ("While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action."); *see also Spencer v. Thomas*, No. 00 C 1020, 2001 U.S. Dist. LEXIS 10033 (N.D. Ill. July 16, 2001) (communicating with an employee via letter not an adverse employment action).

Second, Defendants have offered a legitimate, non-invidious reason for sending the letter, and Plaintiff has not shown the reason was pretextual. The letter in question was sent a month after Sobczak had hand-delivered a letter to Shrader asking to speak with her about patient care issues and expressing his concern about her past unwillingness to discuss them. Plaintiff did not respond to that letter, and Sobczak was unable to reach Shrader by calling both her and her mother. Whatever the reasons why Plaintiff did not schedule the meeting requested in the earlier letter, Sobczak's method of ensuring Plaintiff received his latest message was reasonable under the circumstances. Moreover, while it may have been unusual for Sobczak to call Shrader's mother and communicate through certified mail, Plaintiff has failed to offer proof that Sobczak's reasons for doing so were not honestly believed. *See Miller*, 203 F.3d at 1008-09.

### 6. **Monitoring Plaintiff's Work**

Plaintiff does not dispute that as a doctor, her work, like that of all others at PAA, was subject to the peer review process. She asserts, however, that the level of scrutiny to which her work was subjected was much greater than that of other PAA doctors, and this monitoring was done in retaliation for her 1998 complaint. In support of this contention, she relies solely on inadmissible hearsay, which is incapable of creating a genuine issue of material fact that would allow her to defeat a motion for summary judgment on this point. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994).

There is no admissible evidence in the record that the manner in which her work was monitored represented an adverse employment action given the prevalence of peer review in the medical setting and the undisputed fact that all other PAA anesthesiologists had their cases reviewed. *See Patt v. Family Health Sys.*, 280 F.3d 749, 755 (7th Cir. 2002) (holding that plaintiff failed to establish an adverse employment action because she was contractually obligated to participate in peer review and offered no facts to conclude that the number of her cases referred to the peer review committee was inordinate in comparison to her male colleagues); *see also Summit Health v. Pinhas*, 500 U.S. 322 , 327-28 (1991) (noting that the use of peer review proceedings routinely affects doctors' employment opportunities in consideration of an ophthalmologist's claim alleging a restraint of trade in violation of the Sherman Act). Plaintiff has offered no admissible evidence that the degree to which her cases were monitored was an adverse employment action or that she was treated differently than other similarly situated employees.

### 7.  Refusing to Accommodate Plaintiff's Health Needs

Plaintiff contends that Defendants retaliated against her by failing to accommodate her efforts to conceive. Plaintiff concedes that she never specifically asked for time off for this purpose. (Shrader Dep. at 220-21, Defs.' App. at 34-35.) She claims, however, that she was refused her request for generally reduced hours in order to put her body on a normal schedule to facilitate conception. First, Defendants' failure to offer Plaintiff a new schedule, which she had never previously worked except for the time she was injured in 1998, by definition cannot constitute a "'a materially adverse *change* in the terms and conditions of employment.'" *Rabinovitz*, 89 F.3d at 488 (emphasis added); *see Smart,* 89 F.3d at 441. Second, it is undisputed that no other PAA employees, similarly situated or not, had ever worked a part-time schedule. Finally, Plaintiff does not rebut

Defendants' explanation that her request for part-time status was not reasonable in light of the demands of employment at an acute-care hospital.

### 8. Refusing to Speak to Plaintiff

In support of her claim that she was retaliated against by Defendants' refusal to speak to her, Shrader offers only a single instance in which Dr. Maksimovich, a PAA shareholder, told Shrader, a non-shareholder, "I'm not discussing anything" when Plaintiff inquired about what had happened at a shareholder meeting. First, there is no evidence in the record that Maksimovich even knew that Plaintiff had complained about her 1998 bonus, let alone that she believed she had been discriminated against. Second, this is an isolated and trivial incident that certainly does not rise to the level of an adverse employment action. *See Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (citing *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000) (canceling a conference called by plaintiff and failing to greet her or speak to her were trivial matters that were not adverse employment actions). Finally, Plaintiff has offered no evidence that shareholders spoke to other similarly situated non-shareholders about shareholder meetings.

### 9. Denying Plaintiff Shareholder Status

Finally, Plaintiff claims that she was denied shareholder status in PAA in retaliation for her 1998 complaint. Defendants respond that they had legitimate concerns about elevating Plaintiff to shareholder, given the series of three patient care issues that occurred in the latter half of 2000. Plaintiff's failure to address these issues with the other shareholders raised additional concerns about Shrader's ability to work with the group as a shareholder. Plaintiff contends these reasons are pretextual because she was not removed from her normal schedule and the patient care issues were not raised with the hospital administration or PAA's insurance carrier.

Plaintiff's argument, however, does not demonstrate that Defendants' stated reasons were pretextual. It is not the Court's purpose to determine whether employment decisions were correct, only that they were not pretextual: "[T]he issue of pretext does not address the correctness or desirability of the reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Miller*, 203 F.3d at 1008-09. The undisputed evidence in the record demonstrates that Defendants believed that certain patient care issues needed to be addressed and that Plaintiff had not made sufficient efforts to resolve them. Plaintiff has not established that Defendants' stated concerns were not honestly believed.

## CONCLUSION

For the foregoing reasons, Defendants Palos Anesthesia Associates and Michael Sobczak, M.D.'s motion to strike [doc. no. 76-1] is granted in part and denied in part. Defendants' motion for summary judgment [doc. no. 64-1] is granted. This case is hereby terminated.

**SO ORDERED**                    **ENTERED:** 9/24/04

                                  HON. RONALD A. GUZMAN
                                  **United States Judge**